Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right. Be seated, please. Our first case we'll call is United States v. Blount, and Ms. Hester, we'll hear from you first. May it please the Court. The government doesn't dispute that Officer Zinorowski had seized Emmanuel Blount by the car. The officer had approached the couple at a run, had begun questioning them with an aggressive tone of voice, had blocked Blount's departure, and had called for backup units in the couple's presence. Under these circumstances, no reasonable person would have felt free to leave when he was ordered out of the car. Just to be, I don't think that's really disputable, but just to be a little more precise, I would suspect that you would agree that it's not just the order getting out of the car, but it's submission to that. In other words, the jurisprudence basically says an officer's order to a suspect is a seizure when he submits. If the person flees or refuses, then it's not a seizure. I thought you remembered the Michigan v. Long. And no, Hodari, Hodari, that's the Hodari doctor. Actually, Your Honor, the Supreme Court has- You have to submit to show of authority. Well, the Supreme Court has recently clarified, and it was actually a civil case. I think it was Vega v. Tico, where it kind of explained what Hodari means. And it's actually not the moment of submission that constitutes the seizure. It's the totality of the circumstances. Well, that's fair enough. I'm not quibbling with you, but I just want to make a point that when a person who's ordered to do something by an officer resists or refuses or flees or runs, a seizure has not been affected. There has to be some point at the riding line. And in this case, it could be somewhat significant because there was a hesitation, and then he did submit clearly. He got out of the car. Well, I disagree. During that hesitation, he was moving furtively, and the officer was troubled by that too, in addition to the other. I disagree, Judge Niemeyer, that that's what Hodari D. says because he was never outside of the officer's control. He was inside the car and fully under the officer's control. Why do you say that? So it doesn't really matter how quickly- Why is he under his control? He's not free to leave because the officer- Who said that? He didn't say that. Pardon me? He just said, hop out of the car. And it seems to me he could have not hopped out of the car. He could have locked the door. The officer didn't say, don't go anywhere or don't think you're under arrest or whatever. He asked some questions. Well, actually, he couldn't have locked the door because the officer was standing between him and the door when he gave that order, and he had his hand on the door. So it's not a question under these circumstances of whether he had yet obeyed the officer's command. It took him 10 minutes. And if anything, the seizure had occurred even earlier than that when the officer called for backup in his presence. That's the point when he hands the money that he's holding to his girlfriend or wife and says, go on in and target and get his stuff. He obviously doesn't feel free to leave, and no reasonable person would have felt free to leave under all of those circumstances. And that seizure violated Blunt's Fourth Amendment rights because the government's proffered factors don't add up to reasonable suspicion that a domestic violence offense was afoot. Let's start with Senarowski's rule that he applied that female victims always lie. While it's appropriate to consider the officer's experience under United States versus Black, safeguards have to be applied to prevent arbitrary seizures on the field with officer-created rules like this one. Senarowski, though, used this rule without any guardrails, and he used it as affirmative evidence of domestic violence. But if this rule is going to be able to eliminate any innocent people from its reach, it can be applied only after officers already have a reasonable suspicion that domestic violence has occurred based on objective facts and the totality of the circumstances. For example, it might be appropriate to apply the rule- About the screaming that he heard when he was contacted by the store employee and got out of the car. I mean, certainly that is part of the totality of the circumstances. What about the report he got from the store employee when they first came up to the officer? So the government claims, first of all, that that report demonstrated that patrons and the employee were alarmed, but that assertion that they were alarmed isn't supported by the record because he testified- But all that would be part of the totality. Certainly, it would be part of the totality of the circumstances. I'm just saying that it would be appropriate to apply this female victims always lie rule if the officer's responding to a report of domestic violence or threat, but that's not what he was responding to here. He clearly testified that he understood from her that it was just a verbal argument, it was loud, and he had no information that there was an assault, a weapon, or a threat. The body cam video refutes the idea- I guess you're making your arguments, but they're somewhat provocative because his explanation is not what you just recited. His explanation is that when he got there, he'd heard this screaming, which clearly indicated to him that the woman was in trouble. When he got there, they said, first, we were arguing, and then they said, oh, we weren't arguing, the child fell down. The explanations kept moving and shifting, and he smelled a rat. This is some problem. He was holding the child, and the question is, he's holding the child and the two in the car, and she's screaming at the top of her lungs, something's afoot. The question is, if he had just walked away as you would have him do, and then Brown had shot the child in retribution, he would have been suspended. He didn't do his job, and so the question is, he is coming upon a situation of disruption. Something's happening domestically between them, and he is trying to allay that concern, and that's what Terry's all about. To be clear, I'm not suggesting that he should have walked away. I'm suggesting that he should have handled this in a different way, by engaging the couple in a voluntary exchange instead of seizing someone without reasonable suspicion that there was actually domestic violence. They had a bunch of interchanges before he said, hop out of the car. They did not have a bunch of interchanges before he said, hop out of the car. He never asked. He had a dialogue with her, and he had a dialogue with him, and he saw the circumstances, and the dialogue was inconsistent. The stories were inconsistent, and it didn't match up to his experience up to that point, and that's what created his problem, and if you confront the actual facts, his testimony, then we can have a dialogue on whether that's sufficient, but to just blush over the fact that he found the stories inconsistent. They first said they were arguing, and then they said they weren't arguing. The noise was from the baby falling and this type of thing, and well, that's my, you know my point, but the point is it's sort of provocative just to summarize the facts in a way that brushes over the hard facts that you have to face. No, I'm not trying to brush over the fact that she screamed, or that- Screamed to the point that he thought she was in trouble. He thought she was in trouble. That happened as soon as he got out of the car, he heard that scream. And then there was an employee had brought it to attention, so somebody else had observed it too. Someone else had observed it. He was part of the- And he ran in response to that. He was sufficiently concerned by what he faced at that point that he ran to the scene. That is true. He ran to the scene. When he got to the scene, the couple were not arguing. They were holding the crying baby. Mr. Blunt was very gently holding the crying baby, and at that point, he described later to an officer, they looked like deer in the headlights, and then the couple opened their doors and began to attempt to explain to him what was going on after they were approached by this officer at a run. Now, he says that their explanations were inconsistent, but the only inconsistency was that she couldn't make up her mind about whether the yelling was an argument or just yelling, and he didn't give her a chance to explain what had happened. For starters- I mean, I think to some extent, I get the point that there's not some major, the red's grain versus red sort of inconsistency, but it's at best chaotic, and it has been before that, the information that Judge Niemeyer and Judge Agee talked about have occurred. So, it seems to me he gets there, and it's not like they're just quietly, calmly explaining things to him. I mean, it's still a chaotic scene, and so is your position really that the officer didn't suspect there was criminal activity afoot up until that point? Yes, because a shouting argument, that is not a criminal act. He had not received a report of a criminal act, and he had not observed a criminal act. But you don't have to have evidence or proof of a crime. You have to have reasonable suspicion that there is something criminal afoot, and with all those facts together, it just seems to me that when he's asking him to get out the car, that's consistent with Terry. And then once he does that, you know, the activities of Mr. Blunt become even more suspicious. So, I'm just trying to, I mean, yeah, I mean, if we can talk about them here like they're sterile, but in the real world, when you see it on the video, it's much more dynamic, and I'm just, it feels like we're trying to take away the actual dynamic nature of the situation even once he got there. I'm not trying to take away the dynamic nature of the situation, but another one of my points is that he's ignoring the totality of the circumstances when he runs up to the car, because the couple is no longer arguing. Mr. Blunt is cradling this baby very gently and trying to her fear, honestly. To give a little more flavor though, when he got there, both of them opened the door and say, we're good, we're good. And which is sort of a very defensive statement. They hadn't even been, nothing been asked or anything, and say, we're good, we're good. And then he asked about this screaming, which is not an argument. The scream was a response to something serious. He said it sounded like the woman was in trouble, and you could speculate that maybe the child was being threatened, or maybe he was threatening her. He had the child. Anyway, the question is, I think, from his point of view, you have to go through his eyes and say, would a reasonable officer in his position suspect that something was afoot that involved criminality as opposed to just a domestic spat? Certainly. He, even when he got there and started seeing the circumstances and asking these questions, and they're basically denying, there's no explanation given why she had that loud scream indicating that she was in trouble. And it wasn't a back and forth discussion. It was a loud scream. And the question is, do you just walk away from that or do you investigate? And he chose to investigate. You investigate by asking more questions rather than just seizing someone immediately. And if the questions don't satisfy the officer because they don't address the evidence or they're inconsistent, both of which occurred to this officer. The only question he asked is, what are y'all arguing about? And that's when she is the first one who says we weren't arguing. But she never disputed that the baby fell. That was her consistent story all along. And you also have to look at what the officer is seeing here, because he's seeing this man holding this baby quite tenderly. He doesn't look like someone who's just engaged in a heated domestic assault. This occurred in a crowded parking lot in broad daylight. And as the court pointed out in Drakeford, that makes criminal activity less likely. And what's more, everything the officer actually did was inconsistent with him suspecting domestic violence because he said his role was to separate the parties and find out from the woman what had gone on. But he took one out of the car first. He allowed the couple's child to wander in the parking lot. Then he handcuffed the woman and failed to ask her what had happened outside of Blount's presence. So that all is a suggestion that by that point, he really didn't suspect that this was a domestic violence situation. I want to take a moment, I'm about to run out of time, to talk about the weapon search. Because even if he did have reasonable suspicion allowing the initial seizure, the search of the car was unlawful because he lacked reasonable suspicion that Blount was armed and dangerous at the time of the search. No one had reported a weapon. He never saw anything that looked like a weapon in Blount's hands or anywhere else in the car. What about the movements that Mr. Blount made before he got out of the car? So the movements consistent with hiding something without more just aren't enough to establish reasonable suspicion under Foster. And if Sidorowski had inferred from some tucking movement that Blount had hidden a weapon under the seat, why didn't he look under the seat first off when he searched the car? He didn't. He went straight for that plastic bag, which he was really concerned about. He observed both. He observed something being handed across and then he observed him go under the seat. So he started with the bag that was handed across and found nothing and he unzipped it and so forth. And then he went under the seat. But if he thought the plastic bag held a weapon, I mean, when he picks it up, you can see there's nothing heavy in it. Why does he rifle through all the papers in there? He's not looking for a weapon. Also, when the officer, as I said, when the officer got her out of the car and handcuffed her, he's obviously no longer concerned about domestic violence. And by the time he actually searched the car, she had finally been given an opportunity to give a more detailed explanation of the baby's fall, explaining that the baby fell. That's why I was yelling. We were arguing about the baby falling, or maybe we weren't arguing, but I was yelling because the baby fell. And consider this too. Blount and McVeigh remained very calm, even while the officer was shouting at them, all the while focusing on the welfare of a two-year-old whom the officer left to wander in a parking lot. The scariest person in this interaction was the officer himself. And Blount, in particular, attempted, he consistently attempted to calm the officer down. Blount and McVeigh's actions are those of concerned parents and not a threat to the public. So under the totality of these circumstances and under the court's decision in Foster, Zinorowski did not have reasonable suspicion that Blount was armed and dangerous. The court should reverse the district court's order and vacate Blount's conviction. Thank you. Ms. Ray. May it please the court. I'd like to just begin with two basic principles that sometimes I think get lost. The first is what's required under Terry? What happened in Terry? The officer saw two men looking into a window, walking by slowly and repeatedly looking into the window. That's all that's required for reasonable suspicion. And why was that enough? Because the officers were seasoned officers. And as this Judge Williams actually said in United States versus McCoy, what normal passengers may have viewed, normal patrons rather or laymen may have viewed as somebody just peeking in a window to see some pretty lady, a seasoned officer could see that as casing a joint. If someone looking at two people walking past a window several times and looking into a store is enough to support reasonable suspicion, so is a screaming woman in the middle of a parking lot on Christmas Eve. And enough of an alarm, and I stand by the characterization that it did alarm people in that parking lot enough for the target employee to reach out to the officer and for other patrons to note that the Supreme Court as recently as 2020 in Kansas versus Glover, courts must permit officers to make common sense judgments and inferences about human behavior. Officer Sinerowski did not say women always lie. He didn't apply a rule that women always lie. What he said is, every single day of my career, I have investigated domestic violence cases. And what I have learned, and he said is that you have to separate, he used the word partner initially, you have to separate them. Did he do that by the time they got out of the car? That's one of the points that Ms. Hester makes. At that point, he's concerned about his own safety and he testified about that. That after he saw Mr. Blunt reach under the seat, he got very nervous. He used words, very nervous. And you can tell that in his, he got really nervous and he explained, I didn't go directly under the seat. I was still the only person on the scene. And so I didn't reach and hide my head because they were still out there. Why was that child running around? Should the child have been running around? Probably not, but he did tell both of them, leave the child in the car, put the child in the car. So counsel, I think that's fair description of the evidence. You also have the reality that many parents have, when nerves are frayed with young children, sometimes you blow up on argument that reaches, is heard and maybe even perceived to be more serious than it is, is really what's going on. And so I appreciate both of these situations. The officer really, I guess, can't afford to take the chance and assume that it's the most innocent explanation. But it almost means that something that happens to many young parents who are sleep deprived and everything else can all of a sudden be suspicion of criminal activity. And what's, how's that supposed to be balanced? Well, I think your honor, first of all, in this case, and I acknowledge that people under stress like that can have arguments that are, don't sound great in public, right? But the difference is this is a seasoned officer who's seen a lot of or accidentally let a child and the other person was angry. This was a woman that he thought was in trouble. And it was somebody that was attracting enough attention and enough concern. I mean, I have to say that most of us, I hope that we would respond the way that these folks did by pointing out what it was and having a patron come and alert the officer. But that's not that common. I would suggest these days that people offer assistance like that and it had to have been serious, or at least it's a fair inference that it was serious, more serious than just, ah, you know, you're, I'm angry with you because you didn't take care of our kid enough. And the child was not actually Mr. Blunt, but which probably makes no difference at all. But I note it because he wasn't married as he said he was. They were not married at the have the screaming that a seasoned officer believes is more, um, is alarming, far more alarming than just a normal argument or even a heated argument. The other thing is he comes and the first thing she says is she gets out. They both open their doors. She says, we were just having an argument. And as soon as Blunt says, we're okay, she changes her story and says, no, no, we weren't arguing. We were just upset because our child fell out of his car seat. So that change in story, along with the, um, the screaming, the fact that it did other patrons and employee was, was, were concerned add up to at least a reasonable suspicion, something he could investigate, something he could seize, uh, just temporarily detained Mr. Blunt long enough to say what's going on. And, and as you're even, uh, even if you want to parse it a little bit and try to understand what the officer was witnessing, a scream that indicates somebody's in trouble is not the component of an argument. An argument is loud dialogue back and forth, interrupting each other and yelling at each other. But a scream indicating someone's in trouble is more consistent with a threat, uh, or, uh, uh, some other, uh, conduct that is not just an argument. Uh, she tried to explain it as an argument. And then as you say, they, uh, even changed that story. That's right. And I mean, I think it's fair to say that this is on a continuum, right? Like what, what's a scream and what's an argument where, where do we fall within those? But the important point is as the Supreme court and this court have both made clear over and over again, this is where deference to police officers experience matters. That is what matters in this case is that we're, we're not, we have to, we are required, this court is required to consider that this police officer who investigated, he said numerous calls of domestic violence every single day thought that scream was more than just a heated argument. Counsel, it, it may not matter here given the charge, you know, the weapons charge is really all we're talking about. But yeah, the search goes on to things that don't really seem to have any real connection and, you know, with weapons and really don't necessarily relate to Mr. Blunt. They're small, small, um, bags or things of, of the driver. Yeah. I guess that's not really an issue for us in this case, but yeah, I mean, there's gotta be some limits on what you are able to do in that situation for a safety standpoint. It seems like it might've gone past that, but even if so, I guess the, the, the gun was found and that was consistent with what he observed. Well, yes, but I would say Michigan versus Long sets the standard and the outer perimeters, which is you're only allowed to search the areas of the car or containers that might hold a weapon. And, um, and, and what I would suggest respectfully is that either one of those, the diaper bag or the plastic bag could have held a weapon. A weapon is not limited to a heavy firearm. And, um, and, and as your counter, a colleague pointed out, uh, it didn't look like he was, uh, when he looked into the bag and zipped a little pocket that he, and he picked up the bag and it was pretty light. He wasn't looking for a weapon. He was probably looking for drugs, my guess, but, uh. Either way, he didn't find anything in either of those places. And so that's not the, the increment. No, I understand. I understand. Right. Was found under the seat. I would suggest that it is perfectly possible that a, there could be a, a, a sharp blade or something like that, that he would want to make sure it didn't exist. Did he in fact find drugs? He did. He found a little bit, 0.31 grams of crack were in the, uh, door jam. I think it was described as the passenger side door jam. He didn't find the drugs, by the way, in either one of the bags. So he didn't find any incriminating evidence in those. And he explained, as I mentioned, why he went to those bags first, as opposed to under the seat, he didn't have backup yet. And he didn't want to take his eyes off of, um, of Mr. Blunt and Ms. McVeigh. Um, so I think that in terms of when Mr. Blunt was seized, it's, it is when there's at least yielding to the officers show or request a force in some way. And so he wasn't seized until after he reached down, but I don't think it matters. Um, I think in this case, we have reasonable suspicion before we ever get to reasonable suspicion enough to investigate and questioning before we get to the, all the furtive movements and reaching under. And, and as your honors have clearly looked at this video, whatever he's doing is odd to say the least the way that he turns. And then just as, you know, um, it's a, it's a very strange way to hand somebody just money. Um, and maybe that's all he was handing Ms. McVeigh, but it was, it, you couldn't see that. Um, the other point I want to make in response to Ms. Hester's clear argument based on the video and the, and the supplemental authorities, Miller actually helps us because what Miller says is for this court to disregard an officer's testimony, the, the video has to clearly contradict it. And, and, and, uh, officer Centerowski testified that that video didn't depict everything he saw. It didn't show every patron in the target parking lot. Um, it didn't show either. He even testified that he could see more of the furtive hand movements than you could see from the body cam. So, um, that video does not clearly contradict his testimony on, on any point. Um, and he explains that he, he has says, yeah, by the time I got to them, it didn't appear that they were screaming or I didn't see that, but I did hear it as I was running toward him. On one minor point, I listened and I tried to hear, I didn't hear any screaming, any audio in the video. Um, and so is there an argument that it, it contradicts that point or that it just doesn't completely capture the entire time period? Or did you hear, do you contend there was something there that might not have been picked up in some way? Yeah, I'm sure, I'm sure many times I looked at this video. Um, I, I thought at the very beginning there was, there was some, a noise and of course the audio doesn't come on for 30 seconds. Um, and so wasn't, I don't know. I don't think it clearly contradicts is the short answer. Um, I do hear something right at the beginning, but more importantly, we don't, we don't have the entire audio for 30 seconds. Uh, it doesn't, it doesn't start. Most of that time he's not out of the car, but he does get out of the car while that's, uh, before the audio really kicks in. Um, your honors, um, in terms of the, I think I've already addressed the reasonable suspicion to believe that he was armed and dangerous, but we do see some very odd and furtive hand movements going on. And it was a re if, if, as I said, if Terry says walking by windows a few times is enough to support, um, reaching under the car. The difference between this case and Foster is he had an eye on the hand. He could, I mean, he could see what he was doing. He saw him and you can see that in the video. He just briefly reaches down. So that's consistent. And that's very different from Foster when the officer was far enough away that all he could see were the upper arms, um, sprinkle the same thing and sprinkle. You could see the hands, but they couldn't see anything. There was nothing that that appeared to be trans, uh, moving drugs between them. But in this case, you can see him tuck some go down as if he's talking something under. And so the, the crucial, what he is tucking and what he has is, is hidden. Um, if your honors don't have any further questions, the United States requests that this court affirm the judgment of the district court and the denial of this motion to suppress. Thank you. Thank you. Miss Ray disaster. The government says that, um, the officer didn't that the officer said he went to the bags first because there was no backup. First of all, that is not in the record. And second of all, it doesn't really matter because if he, if the bags were beyond the scope of a weapon search, they were beyond the scope of a weapon search. And under United States, under Minnesota versus Dickerson at that point, the search is no longer valid. You can't parse out the individual objects that he looked at during the supposed vehicle frisk for weapons to decide whether each individual item was outside the scope of the search. The minute that he goes beyond the scope of a weapon search, it's no longer a weapon search. It is a full blown evidentiary search. And it's really interesting to note too, that if you carefully listen to the, um, the video, he doesn't mention anything about the tucking until he's talking to the officers, other officers who show up after he has already found the gun underneath the seat. But he says to the couple, he's very concerned about the plastic bags. Y'all are handing bags back and forth. Um, and he says, y'all are throwing things. He never mentions you're tucking things when she asks, like, why are you doing this? He says, y'all are throwing things in the car. Um, Foster actually helps us, doesn't hurt us because in Foster, the officer couldn't see the person's hands below the elbows. In this case, officers in Orowski can see the person's hands below the elbows, and he doesn't see anything in his hands. For all but like 10 seconds of this video, Mr. Blount's hands are visible. And the only thing he's holding in his hand is, um, is cash, which after officers in Orowski calls for backup, he hands to Ms. McVeigh and says, go on and target and get him his stuff, talking about the baby. Um, so, so Foster, Foster helps us. And as far as the weapon search, it establishes that there was no reasonable suspicion that Mr. Blount was armed and dangerous. And it is, the government relies with respect to the initial reasonable suspicion, fully on the need for officers to rely on their experience and training. And we don't dispute that that is a factor, but it is possible to put too much emphasis on the officer's experience and training. For instance, in this case, the officer in fact did say that you can't believe a woman in presence of her aggressor. It's on joint appendix 98. Um, a lot of times you just want to save face in front of the aggressor. They will not tell you honestly what has happened in front of a male aggressor. They just won't. Uh, and that is a rule that he's applying and assuming that this is a domestic violence. Well, I think that's an experience rule. And I must say that, uh, it seems to be borne out in lots of cases where, uh, the two are together. The question is whether she's going to inculpate him. And usually, uh, they have a relationship and maybe they have a child together or two children together. And, and, uh, the woman is hesitant about snitching on her boyfriend or her husband. And so she'll say everything's okay, even though it's not okay. And, uh, uh, uh, that's, that's not an unusual dynamic in a domestic context. No, it's not. I'm not saying that it is. I agree with you on that. But my point is, when the officer is allowed to apply that rule before he has developed reasonable suspicion of domestic violence, then you get into the situation that I think Judge Qualbaum was alluding to is like, so, you know, verbal arguments happen all the time and there is no more likely time for that to happen than on Christmas Eve and a Target parking lot or a Walmart parking lot. So that scream, uh, when I read that first, I did not understand him to believe that it was an argument. It was a distress, distress scream, uh, uh, given by a woman who he concluded was in trouble. Now, that is not the component of an argument. An argument is the loud yelling back and forth to each other. And, uh, uh, a scream of distress, uh, to me indicates something different. And apparently the officer thought it did too. Even an argument doesn't explain the scream. I don't I think sometimes those things could be one or the other and it'd be hard to discern. But, but one explanation, at least, you know, given the evidence here could be that it's distress. And I mean, that's the, I think that's the challenge for you that even if you can see that certain situations could be, uh, just an unfortunate, you know, heated argument on the one hand, or could be, you know, uh, the beginning of domestic violence on the other. How do I mean, the officer doesn't have the luxury of just assuming the best and he gets there and he's trying to figure it out. So I think that's the, that that's the problem for me with your argument is that I get, it could be what they said it was, but also get that he could perceive it the other way reasonably. And then I think he's got to do what he did. Well, I agree with your honor that at the point where he hears the scream, he should investigate. Um, but the problem with what happened here is that he ignored all of the evidence that was in front of him, that this was, this was not a threat situation or an assault situation because he had already decided by the time he got there, that this was something more. Um, and that's my point, you know, under Kansas versus Glover, it's not just the reasonable suspicion that the officer has to consider. He also has to consider the things that dispel reasonable suspicion. And he failed to do that here. Thank you, Ms. Hester. Uh, we, as both of you know, you're both experienced lawyers on this circle. We love to come down and shake your hand. And I may make a pitch that we start doing it, but we have still under, we're operating still under the protocols and, uh, uh, COVID. And so we'll forego that, but we'll give you our virtual handshake and thank you for your good arguments. And we'll proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, A. Marvin Quattlebaum Jr.